

# Exhibit 3

# Separator

**From**: Yusuf Kalyango Jr., Ph.D.        **August 20, 2019**
Professor,
E. W. Scripps School of Journalism
Ohio University

**To:**    Sabrina Rose Shifman
Senior Investigator
U.S. Equal Employment Opportunity Commission
Cleveland Field Office
AJC Federal Office Building – Suite 3001
1240 East Ninth Street
Cleveland, OH 44199

Email:     sabrina.shifman@eeoc.gov
Telephone:  (216) 522-7680

Ref:       **EEOC Charge Number 532-2019-01361 Yusuf Kalyango vs. Ohio University**

Subject:    **Detailed Rebuttal to Respondent Ohio University's Statement of Position**

Dear Ms. Shifman:

**Introduction**

Thank you for this opportunity to respond to the position statement submitted to your offices by Ohio University (OU) on June 12, 2019. With all due respect to the university and its Outside Counsel, OU has failed to seriously inquire into the facts underlying my charges. As I will show throughout this rebuttal, I do not believe OU's Position Statement was submitted in good faith to the EEOC, nor fully comprehends the gravity of the charges seriously considered.

In brief, and as detailed below, the university violated its own stated processes and procedures throughout the Title IX investigation and failed at every stage of the process to correct these flaws, although I repeatedly provided detailed information with evidence and requested a review process that would correct for this overt discrimination. Rather than take corrective measures, OU has engaged in ongoing severe, discriminatory, and retaliatory actions against me—from one administrator to another and from one phase of its flawed process to another—unsupported by any factual basis, including, but not limited to, barring me (and, inadvertently my young sons) from the entire OU campus, imposing on me the most drastic disproportionate recommendation for a punishment (de-tenuring), and bringing two additional sham investigations against me.

I have served this university successfully over a decade with annual professional accolades and promotions; it is a major shock to me how this institution treats minority employees who are perceived (proven or not) to have crossed a wrong path. All of the following harms provide detailed discriminatory accounts and supporting documentation. I also present how professors, similarly situated (white/Caucasian professors), who admitted much worse behavior include abuse and assault, received much different treatment and are still fully employed by OU.

1

I.  **Discrimination Harm/Action #1 – Discrimination in ECRC Process Based on Race/National Origin**

   A. **Violation of Title IX and University Policy and Procedure**

On July 6, 2017, Tess Herman filed a Title IX complaint against me with Ohio University's Office of Equity and Civil Rights Compliance (ECRC), which is charged with investigating Title IX complaints. She was my program assistant for Ohio University's international training projects I administered in South Africa and Rwanda in June 2017. Under OU's policies, as well as Title IX itself, her complaint should have been investigated and resolved expeditiously within 90-days so that remedial action, if necessary, is taken immediately. The gist of her complaint was that while we were still in Ohio, on May 28, 2017, to be exact, she claims that I verbally asked her to share a hotel room with me for two nights in Rwanda in mid-June when we got there, which was a few weeks into our entire stay in Africa (first in South Africa, then in Rwanda). In her claims to ECRC, Tess Herman made no allegations of sexual advances for the time we both were abroad together, and she made no accusations of actual physical contact of a sexual nature.

Tess Herman produced no evidence to support her allegation that I "asked" her to share a room (a month later or so for two nights); indeed, the documentary evidence demonstrated that during the second-stage in these university international engagements, I was working in a region about six hours away from the hotel/town where she alleged I asked her (in May 2017) to share a room for two nights (in June 2017). The witnesses I presented (one was with us in South Africa), including two OU senior female professors, validated my statements and documentary evidence.

Further, I presented evidence that the evaluations she had submitted to the investigator to prove her own lack of racial bias had been quantitatively falsified, most of which investigator George Antonio Anaya ignored. I further presented evidence showing that the student had voluntarily resigned from her position and filed this Title IX charge following my e-mail to her on July 5, 2017 (*see entire email, with file name starting as 1j. in evidence packet*) in which I explained how she had mishandled the expense report for these travels to South Africa and Rwanda.

ECRC investigator, George Antonio Anaya, delayed resolution of the charges past the preferred 90-day time period and failed to provide me with "an anticipated timeline for completion of the investigation" as required by the Faculty Handbook, II.Q.4.b. The complaint against me was filed in July 2017; yet for reasons never explained to me, the investigation was extended until April 30, 2018, and although no anticipated timeline for completion was ever given to me, I received the Tess Herman complaint's Memorandum of Findings (MOFs) against me on August 24, 2018, the Friday before fall classes were to begin. Apparently, the college dean knew about the findings, and planned accordingly, days before ECRC broke the news to me.

Perhaps most incredibly, George Anaya, did not even partially credit the statements that I had made, which had been corroborated by two witnesses in Africa (one in South Africa and another in Rwanda). He did not even accept the documentary evidence which conclusively established that the complainant was wrong; but he instead collected inaccurate evidence on his own to contradict all of the above by using a Google search. Further, my complaint to EEOC will show how Mr. Anaya has engaged in creating reports with the worst imaginary descriptors based upon my

2

national origin as African, creating racist narratives based on twisted evidence that paint me and the African countries as lurid stereotypes drawn from a 19th century novel.

The university-employed investigator, George Antonio Anaya, timed the release of the much-delayed MOFs on August 24, 2018, so as to generate the most dramatic impact on my employment and my reputation, which was two weeks after OU signed a new policy into effect that created the university-wide University Professional Ethics Committee (UPEC). Further, it was only due to the excessive delay in resolving the complaint that I was retroactively subject to the new procedure adopted by the university after the changes in August 2018 – more than a full year after the complaint was brought against me. This should not have happened.

George Antonio Anaya based his findings of culpability based on his overt prejudice against me, a black man whose national origin is African. He used the most racist biases in his MOFs to find that Tess Herman (American white/Caucasian), had been secluded by me in a dangerous corner of a dangerous country for sinister purposes.

> Respondent's conduct must be also considered in light of location and context in which the alleged conduct occurred. Respondent's conduct all occurred in the context of Complainant's relationship with Respondent as a graduate student and program assistant for Respondent. Further, although Respondent requested Complainant share a hotel room with him before they left for Africa, Respondent requested to share this room with Complainant on the geographically isolated border of Rwanda in a lake-side resort. These facts also support a finding that Respondent's conduct created a hostile working environment.

> There were no evidence of any physically threatening behavior by Respondent. Therefore, this factor weighs against a finding of a violation.13

> Respondent's attempting to convince Complainant that she would be exposed to some level of danger if she chose to remain alone at the Lake Kivu resort could be considered somewhat humiliating. Similarly, Respondent's email of July 5, 2017, wherein Respondent chastised Complainant but did not address the issue of his having failed to meet with her repeatedly, could also be considered somewhat demeaning and humiliating. Therefore, this factor weighs somewhat in favor of a finding of a violation.
> [Memorandum of Findings August 24, 2018, p. 34; provided by OU with Position Statement]

Anaya had no evidence I ever tried to convince Tess Herman that I was leaving her in 'danger'. Three students had been to this part of Rwanda in the past three years (each alone), sponsored by my journalism school as foreign correspondent interns, and each stayed there for 90 days, alone!

His racist imaginings and subjectively selective use of accusations from Tess Herman led him to make biased conclusions of guilt against me in spite of the documentary evidence and witness statements supporting my defense, which he never considered. I told Anaya, and later UPEC, and the provost, and the president—as discussed below—that I had worked with more than 100 female students and colleagues over a period of ten years conducting more than two dozen international study/ engagements/training programs primarily to Africa and to Asia.

3

To make matters even worse for me, the procedure applied to move forward my case after ECRC's MOFs became in use effective August 2018—the same month the ECRC issued its MOFs against me. Given the significant change in procedure as well as the ease with which a faculty member can now be subjected to loss of tenure and/or dismissal, the retroactive application has worked a special hardship in my case; which in all judicial and procedural fairness should never have applied in this case. I believe George Anaya planned this on purpose.

Before August 2018, the 2017 Faculty Handbook did not provide a list of disciplinary actions under section Q. and review of the ECRC MOFs were conducted by either the college or regional Professional Ethics Committee (OU Faculty Handbook, II.Q.3, updated Feb. 2017). The 2017 Handbook provided for appeal from any action of the college or regional Professional Ethics Committee through the grievance process (OU Faculty Handbook, II.G., "Faculty Grievance Committee," updated Feb. 2017). Although one could always lose tenure and/or be dismissed for "adequate cause," prior to the July 2018 resolution—which was applied retroactively to me—such a process rarely occurred outside the context of one's department. See OU Faculty Handbook, II.D.5., "Loss of Tenure."

### B. Sham Investigation by ECRC's George Anaya; re: Retaliation (Bailey Dick)

Due to the egregious delay in resolving the Tess Herman allegation in a timely manner, her complaint was still pending against me in February 2018. I was a member of the journalism graduate committee for nine years and we annually reviewed and commented on all doctoral applicants before we vote on them in this committee. On this fateful account, my colleague, a white/Caucasian female professor, Mary T. Rogus, implored and encouraged me to give my assessments on the Bailey Dick from our M.A. program, who worked for us in summer of 2017 on one of our programs called "SUSI". Mary Rogus and I discussed the matter to give Bailey Dick the assessment of insubordination while she worked with us; and because of that, Bailey Dick was not initially admitted to the doctoral program. Typically, our discussions in the committee are intended to speak frankly about a candidate's weaknesses and strengths.

Tess Herman (who by then had accused me of sexual harassment), filed a retaliation complaint against me on behalf of Bailey Dick on February 28, 2018, alleging that Bailey Dick was not admitted into our doctoral program because she was a witness in Herman's Title IX complaint.

Prior to our journalism graduate committee meeting and vote, investigator Antonio George Anaya knew, and had informed me and Professor Mary Rogus, that Bailey Dick was not a witness in the Tess Herman complaint. Nonetheless, he opened a full investigation on the basis of retaliation, against me. This new investigation, as well, was protracted long past the preferred 90-day deadline for resolution. Anaya's discriminatory bias can be seen also in only targeting just me, but not Professor Mary Rogus (a white/Caucasian professor), who immediately went to investigator Anaya upon launching the retaliation investigation against me and self-reported herself that if anyone should be blamed for reporting Bailey Dick to the committee for her unprofessional conduct and insubordination, it should be herself (Mary Rogus) and not me.

Not only was this sham 'retaliation' investigation egregiously delayed (*please see in evidence packet documentary evidence file starting with 1a. and 1b., requesting resolution*), but the

4

investigator timed the due dates of my written responses—which he arbitrarily imposed—to correspond with the due date of my written response to the Tess Herman MOFs in retaliation for my insistence on an appeal to UPEC. In addition, ECRC continued to further restrain me from using campus facilities including such necessities as the copying machine or my office computer (*please see in evidence packet documentary evidence file starting with 1c.*).

As with the Tess Herman investigation, the ECRC investigator in this case delayed resolution of the charges past the preferred 90-day time period and failed to provide me with "an anticipated timeline for completion of the investigation" as required by the Faculty Handbook, II.Q.4.b. The complaint against me was filed in February 2018; yet for reasons never explained to me, the investigation was extended through October 2018, and although no anticipated timeline for completion was ever given to me, I finally received a MOF finding no cause for this Title IX complaint (*please see "Transmission Letter" in evidence packet, file starting with 1d.*):

> Therefore, there is insufficient evidence to establish that Respondent took the adverse action against Complainant because Complainant participated in the investigation of the complaint of Witness E, because there is insufficient evidence to establish, by a preponderance, that Respondent knew that Complainant had participated in that investigation.

> In conclusion, given the information disclosed to ECRC, the Investigator concludes that there is insufficient evidence on which to base a finding that Respondent's alleged behavior constituted retaliatory harassment and retaliation against Complainant because of her participation in the investigation of the complaint of Witness E. Accordingly, the Investigator finds that the allegation of retaliation is **UNSUBSTAINTIATED**.
> [Memorandum of Findings, March 21, 2019; for the Bailey Dick – "Retaliation"]

### C. Sham Investigation by ECRC's George Anaya: Lindsay Boyle *Resurrections*

George Antonio Anaya was not done with me. He found a helper that boosted his resolve to go after me, a motivated colleague, Professor Michael Sweeney) whom I had mentioned to George Antonio Anaya about his discrimination practices. Anaya, with the help of Professor Michael Sweeney, re-opened a 2012 investigation in which Ohio University has exhaustively determined that I had not done anything wrong in my very first Study Abroad Program to Zambia, as an assistant professor. The student in this 2012 matter was Lindsay Boyle. The predecessor to ECRC back in 2012 did investigate these Lindsay Boyle claims, and did so well within the 180-day period for filing complaints, reaching its conclusion in February 2012 for a study-abroad program that took place during the winter break of 2011 in Zambia. That prompt 2012 investigation and resolution of the allegations in 2012 accords with the purpose of Title IX, which is to afford a swift remedy to claims such as hostile environment.

The investigation was initiated by Laura Myers, then Director of the Office of Institutional Equity (now ECRC), on January 3, 2012, immediately upon receiving notice of a negative evaluation from the study-abroad trip about another host Zambian professor (EP, p. 42). Laura Myers is the 'outgoing' Chief of Staff for the Executive Vice President and Provost, Ohio University. As the Provost's Chief of Staff, she was also fully engaged in this post-MOFs process and in ECRC's broader business, albeit by extension. In resurrecting claims in which I was exonerated back in

2012, Anaya stated that the policy in effect at the time of the allegations in 2012 contained a 180-day time limit to report, but that "the similarity of allegations between those made in this case and those made against Respondent in another case raised a concern that there has been a pattern of behavior. Therefore, under Title IX, ECRC felt an obligation to investigate." (MOFs, p. 15).

In 2012, after its investigation, the Office of Institutional Equity concludes in that MOF report:

> Institutional Equity has conducted an inquiry into the allegations of an improper relationship against Respondent A. The student alleged to have been involved denies the allegations. Respondent A also denies the allegations. The allegations have not been substantiated and there is no independent evidence to indicate their truth.
> [2012 Memorandum of Findings, p. 3].

George Anaya made a different conclusion, on May 30, 2019, from the initial exoneration in 2012! He even concluded that "the similarity of allegations between those made in this case and those made against Respondent in another case raised a concern that there has been a pattern of behavior. Therefore, under Title IX, ECRC felt an obligation to investigate." (MOFs, p. 15).

Anaya asserted in his May 30, 2019 MOFs that he received the statement from Lindsay Boyle on March 3, 2018. This was six months before the MOFs were released against me in the Tess Herman case (August 2018) and eight months after the ECRC opened the Tess Herman case (opened this case in July 2017). By all accounts, the Tess Herman case itself was already in limbo under George Anaya—beyond the ninety (90) days as well—and he was not following notification (updates) procedures. In other words, there would have been no "pattern" for Anaya to use as a pretext for reopening this investigation if he had, in fact, opened it in good faith and without a racially motivated animus, a retaliatory intent, and a clear reverse-gender bias.

Please take special note that George Anaya uses this pretext of pattern twice: once to "reopen" the case, and again to assert that since he did find against me in the MOFs regarding Tess Herman, that weighs in favor of finding me guilty again. He writes:

> Other corroborating incidents also strongly support a finding of harassment. Complainant's allegations in this case are significantly similar to the allegations made by another student complainant following a fall, 2017 trip to Rwanda that the other complainant took with Respondent. The central allegation in that case was that Respondent had invited the student to spend the night alone with him in a hotel room overseas – a strikingly similar allegation to those made by the Complainant in this case. The allegation of sexual harassment by hostile environment was found to have been substantiated in that case. While certainly not dispositive, this supports a finding of sexual harassment by hostile environment in this case. MOFs, p. 19.

It should be clear that the ECRC and George Anaya "reopened" this case just for such a result. That is, the case was reopened, and then delayed, to build a case for a "pattern." Yet, even with this resurrection of the closed case, George Anaya's evidence he collected does not produce any material evidence that directly shows communication between me and the Complainant on the allegations pertaining to Washington D.C., and my conference trip to Santiago, Chile. Details of such misrepresentation and discriminatory behavior by George Anaya are staggering.

George Anaya relies on the statement of policies in effect at the time of the allegations (2011-12) in his 2019 MOF, but relies upon the standard of proof in effect in 2019, that is, the lower standard of preponderance of the evidence (MOFs, p. 15-16). The clear and convincing standard would have been in effect in 2012. **The inconsistent and retroactive application of university policy is used to prejudice me at all levels. Moreover, I was cleared of any wrongdoing back then in 2012; but in retaliation, he somehow finds wrongdoing against me in 2019**.

No known white/Caucasian university professor at Ohio University, male or female, has ever been the subject of such targeted lack of due process and the reopening of a six-year old closed investigation (in which I was cleared of any wrongdoing back in 2012).

The investigator's dishonesty in the May 30, 2019 Lindsay Boyle MOF's must be placed in the context of the ongoing federal lawsuit brought by Tess Herman against Ohio University and myself. He was actually served on April 30, 2019, exactly 30 days before he releases his MOFs against me that is biased and retaliatory. In that lawsuit, I name investigator George Antonio Anaya as one of the defendants in a Cross-Claim in which I claim that Anaya personally exercised a discriminatory, race-based bias against me in the previous MOFs (Tess Herman) he issued against me. George Antonio Anaya, an attorney, knew of these allegations, had received a summons on April 30, 2019 to answer the charges, and knew, as a professional, that he had an unmistakable conflict-of-interest to further pursue this investigation. Any such investigation should have been handled by an entirely different investigator.

Please read the entire statement about Lindsay Boyle's matter: *file name starting with 1k., evidence packet*, for the distressing details of dishonesty and discriminatory behavior by George Anaya.

### D. ECRC Did Not Investigate My Complaint of Retaliation Against Prof. Sweeney

Ohio University's Office of Equity and Civil Rights Compliance (ECRC) functions as the institutional conscience of the university: it is tasked with investigation Title IX complaints and ensuring compliance with a panoply of civil rights protections afforded to individuals within OU, most notably, Ohio University Policy 40.001, entitled "Equal Employment and Educational Opportunity," and Ohio University Policy 03.006, entitled "Whistle-blowing and Retaliation."

On multiple occasions, I informed the ECRC that I was the subject of discrimination and retaliation through the actions of Professor Michael Sweeney (*goes by Mike instead of Michael*). I informed George Anaya during my interview regarding the Tess Herman investigation matter that Professor Mike Sweeney (white/Caucasian male) engages in discriminatory practices based on race and national origin in the admission process of minorities and international applicants from Africa and other third world countries (*See documentary evidence in the evidence packet extracted from a statement I sent to George Anaya by email on June 8, 2018 – file starting with 1e.*). Later on, I also told George Anaya that Prof. Mike Sweeney was retaliating against me for protected academic comments I had made during the discussion on her admission to the doctoral program. I also informed investigator George Antonio Anaya in my interview and in a statement dated June 8, 2018 that Professor Mike Sweeney (white/Caucasian man) was singling me out because of my race and national origin and battling me for his own failures as a graduate director, which should

have triggered an investigation -- but George Anaya, once again, decided to ignore my rallying cries. Investigator Anaya did not include my statements concerning Mike Sweeney in the summary of statements and he also ignored it entirely in all his MOFs for Tess Herman, Bailey Dick (retaliation matter) and even Lindsay Boyle (2012 resurrected allegations).

> Witness Q is also very much aware that some graduate faculty members, including myself, are now calling upon the graduate director (Mr. Mike Sweeney recently resigned from that position) to stop these kinds of favoritism, where candidates such as Witness Q (from Denmark) gets admitted into the graduate program (both the M.A. and Ph.D.) with low GRE scores that violate our own admissions policy while other international applicants, especially from "non-white" developing countries such as Africa are not accorded similar privileges. Thus, witness Q is motivated to take hostile action toward me such as submitting this false statement.
>
> [See file starting with 1e. in the Evidence Packet]

OU investigator George Anaya knew for a fact that I had voiced my concerns over the lack of diversity in our admissions directly to Professor Sweeney, who was the Chair of the Graduate Program. I also had directly questioned Professor Sweeney why we were not admitting more minority students, given that we were admitting applicants with GRE scores below our threshold. One time, he turned down a Jewish student who visited our school to inquire about our Ph.D. program. I took that student to Sweeney's office but he never followed up with her. The controversy Sweeney manufactured in his meetings with Anaya and in his draft memo (see file name starting with 1i. in evidence packet) over Bailey Dick was an extension of his discriminatory admissions policy that favored white/Caucasian students, even when they did not meet our requirement standards for admission.

Although OU investigator, George Anaya, had this knowledge of retaliation and discrimination and even approved one of Prof. Mike Sweeney's smear campaign (*see his statement he read to our committee in my absence, file starting with 1i. in evidence packet*), he refused to acknowledge it or recognize it. Although the Director of the ECRC and George Anaya both had my formal complaint and request for investigation in their email's in-box filed on October 8, 2018, absolutely no action was taken to enforce Ohio University Policy 40.001, or Ohio University Policy 03.006, or multiple other policies that his public comments violated.

Professor Sweeney was the associate director of the journalism graduate program in my school in 2012. He knew Lindsay Boyle through his Ph.D. student he mentored, Molly Yanity, who later became Lindsay Boyle's wife. The following facts were presented to the Provost's Office:

> On **Wednesday February 21, 2018,** the journalism graduate admissions committee met from 3:30 pm to 5:00 p.m. During that meeting, the committee decided not to admit Ms. Bailey Dick to the doctoral program. I expressed my professional academic evaluation of this applicant, based upon this applicant's work in my programs, and my evaluation was not positive. My comments were among other discussions of the applicants' pool by committee members during that February 21, 2018 meeting. Professor Mike Sweeney was Bailey Dick's advisor and he had already proclaimed throughout the academic year that she was one of his "favorite students," as he once boastfully told us. He was not at the meeting when we took the vote to not admit Bailey Dick into our doctoral program.

8

Professor Sweeney was not happy with our vote, particularly my comments in this journalism committee to admit doctoral students, and he decided to take matters further against me upon hearing what had transpired in this faculty meeting.

On **March 21, 2018,** George Anaya informed me that he was initiating a retaliation investigation against me based on my comments during the admission's process. That investigation eventually (in March 2019) found that I had committed no wrongdoing.

The following day on **March 22, 2018,** the journalism graduate admissions committee reconvened at the request of Professor Mike Sweeney, where he read a prepared two-page document that discredited me based upon the retaliation action filed against me—not filed by Bailey Dick—but filed by Tess Herman; and a second sexual harassment investigation that Sweeney does not name. It is clear from Mike Sweeney's document that he had some cooperation from the Title IX investigator, George Anaya, in presenting this discrediting and slandering premature information. That document that Sweeney read out to the committee is in the first evidence packet.

It is clear from that document that in late February/March 2018, **Professor Mike Sweeney stated that he had already talked by phone with Lindsay Boyle at length about the Tess Herman case.** [See Mike Sweeney's 'statement' file starting with 1L. in the EP]

That 'Sweeney document' he read to the graduate journalism committee (my colleague) contains information that discloses how investigator Anaya, must have shared with Sweeney in March 2018, as evinced by his prepared smearing statement read to my colleagues in my absence.

It also directly contradicts the investigators own statement in the MOFs:

> The Investigator initially contacted Complainant after Witness A [Sweeney] advised the Investigator that Complainant may have been subjected to some type of inappropriate behavior in the past. (MOFs, p. 1)

From the Witness A statement, it is clear that Professor Sweeney reached out to Lindsay Boyle, most likely after Bailey Dick was denied acceptance into the doctoral program, and that he is very good friends with Lindsay Boyle's wife, Molly Yanity; that he remains close friends with both and maintains collegial relationship with Yanity in academe.

It may appear very petty for a professor, Mike Sweeney, to manufacture and stage a sexual harassment claim against me based upon the admission of one's advisee to the doctoral program, but Anaya had credible evidence that that is what, in fact, happened. Anaya has demonstrated extreme bias and what I consider to be racial discrimination in failing to acknowledge Professor Sweeney's lack of integrity, candor and his motives in this case. ECRC protected him, too.

The failure to even acknowledge my complaint about Professor Sweeney (a white/Caucasian man), in light of the information it had, and in light of the severely prejudicial statements made to the media about me by Sweeney (*see file starting with 1h. page 2 and 3 in EP*) and through the leak of the inflammatory and racist MOFs for the Tess Herman case, demonstrates severely discriminatory conduct on the part of the ECRC.

9

## II.     Discrimination Harm/Action #2 – Discrimination in the UPEC Process

When the Provost's Office in conjunction with the Chair of the Faculty Senate convened a University Professional Ethics Committee (UPEC) of six members, I made prior timely requests (*see email, file starting with 2a. in evidence packet*) pertaining to the importance of assembling a diverse committee. I acted upon my intuition and ongoing frustrations with the university process because of the experience I had with the OU investigator, George Anaya, who had proven to me that individuals who have no international experience in Africa or the kind of work I did with students in Africa would most likely not get a better appreciation of what it take and involves. The former Chair of the Faculty Senate, Dr. Joe McLaughlin wrote to me in an email and the gist of that communication is as follows:

> As described in Dean Titsworth's email, I will be working with the Provost "to convene a review committee of the University Professional Ethics Committee" (Faculty Handbook II.Q4.c-iii.) As the Handbook mandates, the UPEC will be established within twenty-one days.
>
> I echo Dean Titsworth's recommendation that you familiarize yourself with section IV.L.3.b.i-iii concerning how the UPEC is formed. Please note that the UPEC membership cannot include anyone "from the same department or has close personal or professional ties with the faculty member".
>
> [See email file starting with 2c. in the Evidence Packet]

It is clear from this initial interactions with the powers that be that this was going to be a biased process. In the above statement, the Chair of the Faculty Senate only mentions to me that UPEC membership cannot include anyone "from the same department or has close personal or professional ties with the faculty member"; but does not indicate how conflict of interest will be prevented on the part of the accuser/student. It appears the panel was assembled with the goal of preventing anyone with sufficient expert knowledge, assimilation (race or otherwise) to be on the committee, but the same was not done on the part of the white/Caucasian student. The same argument is made by the outside counsel representing Ohio University in the Position Statement, "Distressingly, Dr. Kalyango appears to discount any diversity a peer of Asian heritage would bring to his panel." This is an unfortunate and baseless argument on the part of Ohio University. My argument and request of having a member who knows and has experienced working with students anywhere on the African continent should also not have been discounted!

The outcome of such a formed UPEC membership in the Tess Herman investigation ultimately confirmed the worst fears of a person who looks like me… considering hypothetically in today's America a scenario whereby a black man facing an all-white jury in a court of law, with an all-white prosecutorial team, and not allowed to be represented in that courtroom neither by counsel or nor witnesses. The Provost, evidently, formed the UPEC that would please the Complainant, Tess Herman (*see file starting with 2d. in Evidence Packet*).

On appeal from the ECRC's biased MOFs in the Tess Herman case, the UPEC produced a shockingly biased report accusing me of engaging in "grooming" activities and recommending de-tenuring, a draconian unprecedented punishment even if the allegations against me were found to be true (which they are not).

10

The UPEC even denied my request for the right to bring witnesses—Professor Mary Rogus—to the October 18, 2019 hearing (and then I got criticized by the same Committee in their report for not doing so!

To establish that I did request the right to make a presentation and bring one witness, procedures which the Faculty Handbook provides, and yet was denied these rights, I have included my e-mails to the Chair of the UPEC, Shelley Delaney. The facts are also presented in the included appendix. The complainant, however, was allowed to bring a "support person," who may have also been a witness. The identity of this person was never disclosed to me but I later was informed that it was Bailey Dick, a doctoral student involved in the retaliation accusation.

> For this meeting, we'd prefer the time be used specifically for a dialogue with you. The committee has carefully reviewed Professor Rogus' testimony, and if we determine that we need to speak further to a colleague of yours, we will reach out to Professor Rogus for an interview at another time. Sincerely, Shelley Delaney
> [See email file starting with 2e. in the Evidence Packet]

Further, George Antonio Anaya was also given an opportunity to speak to UPEC to defend his MOFs, although I had directly proved the factual inaccuracies and bias of the investigator in my written statement to UPEC and in the handout I prepared for them on October 18, 2018 (*See file starting with 2f. in the Evidence Packet*); UPEC at no point considered these facts or even allowed me to present these facts myself or through a witness. I had identified, further, additional specific witnesses that UPEC could contact directly to substantiate my innocence. I even submitted photographic evidence. Every bit of it was ignored.

Contrary to the statement in the UPEC findings, I was not even given the fifteen (15) minutes to address the committee as was the case with Tess Herman and investigator, George Anaya. I was questioned solely by the chair for a solid forty-five (45) minutes, at which point, my time having been exhausted, I was ushered from the room because there was a class starting promptly at noon. I had been informed that I would be questioned for thirty (30) minutes and be allowed fifteen (15) minutes to speak with the faculty members of the committee, which was accorded both Tess Herman and George Anaya (who met the committee for a full consecutive hour before meeting with me in the third hour. At no point was I given the opportunity to address UPEC (*See email file starting with 2j. in the Evidence Packet*).

The procedural and factual bias of the way UPEC was formed to hear my case, the UPEC's flawed hearing process, the UPEC written report filled with racially charged language (and demonstrated in the following two sections), and the UPEC disciplinary recommendation (de-tenuring) demonstrate extreme racial discrimination and discrimination based on national origin.

III. **Discrimination Harm/Action #3 – Discrimination through the Provost's Actions**

On September 28, 2018, the Chair of the Faculty Senate, Dr. Joe Mclaughlin notified me via email that he and the Provost had convened a review committee of the University Professional Ethics Committee (UPEC) to review findings of sexual misconduct by the Office of Equity and Civil Rights Compliance. "The committee will be **chaired by Professor Shelley Delaney** (Fine Arts )

and will include the following UPEC members: Cheryl Geng (Health Sciences & Professions), Neil Littell (Engineering), Berkeley Franz (Heritage College of Medicine), Kevin Spiker (OU-Eastern), and Qiuping Cao (OU-Lancaster)." This UPEC that was set up by Chair of the Faculty Senate and the Provost was composed of five white (Caucasian) faculty members and one Asian. Also, it is important to note that this was the very first UPEC ever convened at the university level to look into these matters and I was its first faculty member under review.

Prior to convening this UPEC, I wrote to the dean of my college, Dr. Scott Titsworth and notified the university that, "The integrity of the process has been tainted because of the premature circulation and added to by the large amount of negative commentary on social media by one senior faculty member in the E.W. Scripps School of Journalism to our alumni and graduate students, which has greatly prejudiced the next phase of this process, and my future appeal rights, if warranted." In that important email, I attached a "request" letter outlining my concerns with the university process, moving forward, and appealing to Ohio University to consider remedial measures to help ensure a fair process moving forward, chief among them, was the following:

> The Professional Ethics Committee should have at least some representation from international faculty members; additionally, the Committee should have some faculty members who have worked on Study-Abroad programs, and among those three faculty members, hopefully some should have some experience supervising student-workers in Africa or similar regions. It is apparent in the ECRC investigator's findings that he ignored or was not cognizant of the apparent intercultural misconceptions and awareness of what it means and what it takes to prepare students and student-workers to travel abroad to African countries. The investigator also clearly ignored in his report the statements provided in his interviews with senior faculty members (female professors) who spoke to him on my behalf during his investigation.
> [Request letter sent on August 6, 2018, file starting with 3a. – page 2, in the EP]

The dean forwarded my request letter to Provost Chaden Djalali but then I also resubmitted it directly to the Provost and to Dr. McLaughlin to ensure that those requests are considered in the formation a newly constituted UPEC. One September 7, Dr. McLaughlin acknowledged receipt of my message and letter. In his email dated September 7, 2018, he stated that:

> Please note that the UPEC membership cannot include anyone "from the same department or has close personal or professional ties with the faculty member". Although it is not mandated by the policy, my intention is to also exclude anyone from your college.

You will notice that I never requested the Provost or the Chair of the Faculty Senate to include on the committee a faculty member from my department or anyone who has close personal or professional ties with me. I requested for an internationally diverse faculty that would be familiar with the kind of work I do, unlike the sole investigator who did not understand the cross-cultural dynamics at play and who does not have an understanding of Africa and the way we conduct business in Africa with student workers. But the irony of such a statement from Dr. McLaughlin and by extension the Provost's Office was to suggest that focus was to ensure that no one would be included on that committee that "understands me, my work" as a faculty member. **So, the committee members put together had a lot more in common with the Ms. Tess Herman, a white/Caucasian female accuser, than they did with me, a minority black male faculty defendant whose national origin is African.** To be specific, there were majority women on that

formulated committee, majority white/Caucasian committee members and definitely more white/Caucasian committee members.

On October 2, 2018, I submitted a statement addressing the allegations and the MOFs for Provost's office and the UPEC members to consider in their deliberations and recommendations. In that statement addressed to both UPEC and the Provost, I made it clear to the committee that the investigator, George Antonio Anaya, presented a report riddled with inconsistencies and inaccuracies. The biggest, of course, was the assumption that the room reservation was made for the purpose of "sharing" a room with the Complainant. This was not true, but the way the report was written did not make clear my position. It turns out that he actually was biased against me. This is but one example of the investigator ignoring or misstating the information I presented and my witnesses offered. That information showed that I did not sexually harass the Complainant or create a hostile environment.

Both UPEC, which was predominantly composed of white/Caucasian members, saw things differently because of a racial U.S.-centric predisposition. In my statement, I stated that:

> It is apparent from the investigator's MOFs that he did not fully grasp the important cultural differences that occur in this kind of work and travel. There are many and well-documented intercultural challenges between inexperienced young Americans traveling for the first time to and socializing alone in Europe. I am not suggesting that sharing a room with a student is a "cultural difference"-- that would always be inappropriate. But, some of the texts, emails, and other communications that occur can be, and have been here, misunderstood.
> I have hired, supervised, and mentored more than 100 female students (both graduate and undergraduate) who have worked with me on dozens of Institute for International Journalism's projects in the past ten years; and none of those students have ever made such a complaint.
> [Statement to UPEC dated October 2, 2018, file starting with 3b. – page 1, in the EP]

In the previous section (Discrimination Harm/Action #2), I have enumerated how the UPEC showed is discrimination and bias when the Chair of UPEC, Professor Shelley Delancy (white/Caucasian female) denied me certain rights and opportunities that she provided the accuser (white/Caucasian female) on different numerous occasions. I also outlined in the previous section (Discrimination Harm/Action #2) the racially charged language used in the UPEC's quasi-report and recommendations to the Provost. Upon receiving the biased report filled with racial-charged innuendos from UPEC dated November 5, 2018—finding adequate cause to recommend initiation of loss of tenure proceeding---the Provost had about three weeks to assess the report and the ECRC findings before he made his decision. I took the opportunity to once again write to the Provost to remind him of how rights were violated, especially highlighting the discrimination I was enduring throughout this flawed process.

I brought to the Provost's attention that "pursuant to Ohio University Faculty Handbook Section II. Q., entitled "Policy on Sexual Misconduct, Relationship Violence, and Stalking," section 4.d. confines the UPEC to considering "only the charges contained in the ECRC MOF." The charges contained in the MOF against me were allegations that 1. I asked the student-worker to share a hotel room with me (sexual misconduct); and 2. I subsequently sent the student-worker an e-mail

13

that created a hostile work environment (quid pro quo/hostile work environment). I deny both vehemently, but even were they true, the UPEC has clearly strayed beyond its charge in its list of findings against me -- findings that the UPEC use to support the harshest penalty possible -- initiation of loss of tenure proceedings."

In addition to making that point clear to the provost, I also specifically pointed out the racially charged language used by the predominantly all-white/Caucasian UPEC members in their quasi-report and recommendation. This is what I brought to the provost's attention:

> For example, the use of the word "grooming" in the findings, scientifically understood to refer to a socialization process that occurs among underage children (primarily understood to refer to minority females), is highly inflammatory, prejudicial, and racist as applied against me, and is also entirely unconnected to the actual charges against me. (And most certainly not true.) (UPEC Letter of Findings, p. 2).
> [Appeal Statement to the Provost dated Nov. 15, 2018, file starting with 3c., p.3 in the EP]

I reminded the provost in my November 15, 2018 statement that "this UPEC, without following its procedure, without following its own stated process, without permitting me to speak on my own behalf, without allowing me to bring anybody with me, without deeming to interview any of my witnesses, and without even issuing a concrete evidence-specific factual report, has recommended the harshest penalty possible for you to consider. May I also point out that in all fairness in such a process involving international engagements, it was unfortunate that the university did not accommodate my reasonable requests regarding the composition of the committee." But this was not all, I reiterated the discrimination going on with the whole process.

> Allow me to point out that Ohio University has invested a lot of effort to advancing **Diversity and Inclusion as its focal mission**. Not a single faculty member on the UPEC had experience with Study-Abroad programs, much less any experience supervising student workers in Africa. There was not even a single African-American on the committee, in a case involving an African professor and activities of international nature that are central to the allegations. Yet the UPEC saw fit to issue a recommendation wildly disproportionate to the charges contained in the Memorandum of Findings. That is the very definition of an arbitrary and capricious outcome to issue such a recommendation without also including a report with factual findings upon which a reviewer can make a decision.
> [Appeal Statement to the Provost dated Nov. 15, 2018, file starting with 3c., p.4, in the EP]

Provost Chaden Djalali cannot argue that he was not aware of this type of discrimination leveled against me by both his administrators (ECRC) and UPEC. He received ample notifications. Most notably, even Ohio University alum and current faculty reached out to the president and specifically pointed to the doubled standards or discriminatory conduct in this case and process:

> **By Carolyn C. Walcott, sections of email to Provost Djalali, sent Nov. 14, 2018.**
> As his former advisee and now colleague, I must say that I find both the circumstances surrounding the allegations and most recent recommendation to start the process of stripping him of tenure as very unfair, unjust, and quite disturbing. Please permit me to submit this appeal to you in sympathy of Professor Kalyango with a few observations you may wish to consider with respect to determining his fate in this uncharacteristic turn of events that are unfolding at my Alma Mater.

Professor Kalyango's penchant for the academic growth and development of his students is perhaps one of his greatest strengths, which now appears to be the source of contention in the current political climate and ongoing investigations at Ohio University. I know very well and beg to offer that this must be quite disheartening to both Professional Kalyango and the female student involved; but very damaging and destructive to Professor Kalyango's excellent work around the world. The matter now seems to have become a character assassination in the current climate that favors female victims of alleged aggression; although Ohio University should resist taking severe actions in such circumstance.

As a female minority black prospective faculty/educator, currently a teaching instructor at Georgia State University, and former Director of the University of Guyana Center for Communication Studies, I am well acquainted with various forms of aggression and inherent allegations that emerge within professor-student interactions. Such allegations thrive particularly when professors serve as facilitators and overextend themselves to ensure the success of their students. Notwithstanding the seriousness of the sexual harassment allegations, I do believe that a decision to strip tenure from Professor Kalyango is strikingly harsh, particularly given his unblemished track record and years of commitment in service to his department, the university, national engagement, and international reputation.

[*Email to Provost by alumna*, See file starting with 3d.in the Evidence Packet]

**Dr. Elizabeth Hendrickson, email to Provost Djalali, sent November 14, 2018.**
I am writing you to express my profound disappointment with the University Professional Ethics Committee's recommendation that 'loss of tenure' procedures begin for Dr. Yusuf Kalyango, my current colleague and friend since graduate school in 2003.

I believe that while charges of sexual harassment are certainly disciplinary offenses under Title IX, UPEC's findings that Dr. Kalyango's alleged behavior is essentially the equivalent to that of sexual assault or battery and thus deserves equal punishment is unsound. In addition, the group's assertion that he engaged in "grooming behaviors" with the graduate student (an adult) is misinformed, in that with actual grooming, an offender employs tactics in the preparation for committing sexual abuse against a child . In this case, such findings seem situational and morally inconsistent.

As such, I encourage you to consider a less career-damning disciplinary action for Dr. Kalyango, who is both brilliant and collegial. Thank you for your time and consideration, Provost Djalali.
[*Email to Provost by journalism professor*, See file starting with 3e.in the Evidence Packet]

**Prof. Mary T. Rogus, email to Provost Djalali, sent November 13, 2018**
Both Dr. Kalyango and his accuser have suffered a great many personal consequences because of what reportedly happened between them. However, at this moment, the scales are about to be tipped inequitably in terms of their professional lives.

I believe detenuring is the equivalent of a professional death penalty, especially in the context of the current #MeToo climate. Given the ECRC findings, and the report's description of what the investigator believed to be true, I, as a former victim of such behavior and worse, don't think this is a 'death penalty' offense. As a senior faculty member, I find it out of proportion to the findings in the report. As a friend and colleague,

15

> I find it tragic that such a distinguished career would be destroyed by a case that ultimately comes down to who was believed.
> [*Email to Provost by journalism professor*, See file starting with 3f.in the Evidence Packet]

Despite all these calls and abundant information to help Provost Chaden Djalali to make the right decision to remedy this situation by making a different decision other than accepting UPEC's recommendation of "initiation of loss of tenure proceedings", the provost simply condoned these discriminatory actions.

- After all, in Ohio University's Position Statement to EEOC concerning this matter, the university has clearly stated that "…the matter is referred to a faculty committee called University Professional Ethics Committee (UPEC), which reviews the matter and makes non-binding recommendations," (Position Statement dated June 12, 2019, p.2). So, if the UPEC's recommendations to the Provost are "**non-binding**" as the university states, that implies that the onus as a matter of fact is on the provost of the University and the president.

- Also, the university states in the Position Statement that "Notably, the UPEC is an extra layer of procedural protection for a faculty member (p. 2)." Yes on page 4 of the Position Statement, the university argues that "…there is no provision in the Faculty Handbook which would allow a faculty member, such as Dr. Kalyango, to exclude UPEC members simply because of their alleged color or perceived lack of international background." So, if the UPEC is allegedly "an extra layer of procedural protection for a faculty member," then why the objection to my requests to have a diverse committee, which would make informed decisions based on a deeper understanding of my professional work and contributions and how I relate and work with student-workers? I did not ask anyone to be excluded, I asked the university to consider "**including**" (university claims to promote "inclusivity") at least one or two faculty members who share my international professional experience and my racial background instead of a committee that turned out only to fit the student's gender (majority) and racial background (all but one).

Without consideration and shockingly, Provost Djalali decided that all these harmful and illegal practices toward me, being real, do not fall under the grounds for my appeal of a UPEC decision, and he therefore did not consider them. This in itself is discriminatory on the part of the provost of the university who, in fact, had remedial power and authority to make a different decision other than the extremely severe disproportionate 'detenuring recommendation'.

IV.    **Discrimination Harm/Action #4 – Discrimination through the President's Actions**

October 28, 2017, M. Duane Nellis gave a resounding Presidential Inaugural Address in which he outlined his priorities for his tenure as president, chief among them was the issue of diversity and inclusion. In his first address as the 21st president of Ohio University, he said:

> The first key strategic pathway is our continued and bolstered efforts to be **a national leader for diversity and inclusion.** We must establish an environment at Ohio University where difference in all of its forms is welcomed and celebrated. We must be proud of the progress we have made thus far, while still not losing sight of the work that is yet to be done. [See file starting with 4a. – page 4, in EP]

16

In fact, the newly minted 21st president declared in that October 2017 speech that diversity and inclusion was "The first key strategic pathway", among several "strategic pathways and priorities—pathways and priorities that will continue to redefine Ohio University as a leading-edge, public research university." He declared that with his approach to diversity and inclusion and the appointments that will follow under his leadership would "define our University as a place of excellence in the areas of inclusion and social justice," said President Nellis. In that important inaugural speech, President Nellis strongly proclaimed that: [See file starting with 4a. – page 5, in Evidence Packet]

> I am challenging each of our deans, other administrative chairs and directors, faculty, student, and staff leaders to enhance our efforts in this area and specifically to focus on recruiting a more diverse faculty, staff, and student body while ensuring there is a supportive, inclusive environment across all the campuses of Ohio University. We all are responsible for this very important work and a new Vice President will help us get there!

However, if you first-forward a few months or a year later under President Nellis leadership and his 'new' university administration, several black minorities across campus – and other minorities – have either resigned (for example, Dr. **Michelle Ferrier**, Associate Professor, E. W. Scripps School of Journalism) or been fired by the university (for example, **delfin bautista** was the director of the Ohio University LGBT Center); or forced into retirement (for example, **Justice Hill**, Assistant Professor, , E. W. Scripps School of Journalism), and others across campus; but the president has taken no action to prevent such *minority-flight* from the university in some cases (like mine), he has been an accomplice to these discriminatory harmful actions.

On December 26, 2018, I wrote to President Duane Nellis, as provided by the Faculty Handbook's formal appeal process, to evaluate the recommendation by the University Professional Ethics Committee's (UPEC) and the Provost's recommendations to initiate de-tenure me. In that email, I clearly stated that in the email that that the president should care read and consider two attached documents (to that email) in which, "I present, in some detail, the grounds for each aspect of my appeal, beginning with the lack of due process during the Office of Equity and Civil Rights Compliance (ECRC) investigation, then the failure of UPEC to follow appropriate procedures, followed by a discussion of the arbitrary and capricious nature of its findings." The president acknowledged receipt of my email through his then General Legal Counsel, John Biancamanno on January 2, 2019.          [See file starting with 4b. in the Evidence Packet]

One of those attachments was the appeal statement to the president, dated December 26, 2018. In that statement, I point out to President Nellis that actions taken against me by UPEC and the Provost were unprecedented, severe to the extent they mirror how many incarcerated black people in the United States have long received long or life prison sentences for lesser/minor crimes for which white people with similar or worse crimes receive less penalties. For example, I write in the statement to the President that:     [See file starting with 4c. in the Evidence Packet]

> At all times while under ECRC investigation, I believed I would be operating under the procedure that OU has followed since I started teaching here or at the time the complaint was filed against me. If I had known during the investigation that I might be in the position I am in today, appealing directly to you a decision of a third-party committee that I should

17

not lose my tenure, I know I would have responded differently to the complaint when it was first brought against me—not in substance, but in kind—by recognizing that I had now become the subject of an adversarial proceeding.

All of the above and the following flaws of due process enumerated here provide you, President Nellis, sufficient justification to remedy this by reversing the extra-judicial harshest decision to initiate loss of tenure.

I believe both criteria of Section II.Q.4.i. are amply met in my case. As this was the inaugural meeting of the newly created UPEC, multiple procedural errors marred its processes and led to a result wildly disproportionate to the claimed conduct on my part. Further, the recommendations of the UPEC are not supported by the facts, rendering it arbitrary, and indeed, its findings, which may be guided by an overzealous sense of its mission as a newly created committee, are capricious—that is, entirely unreasonable. The UPEC ignored every critical fact I presented in my defense. Our new Provost at Ohio University, moved the case along.

In my appeal statement to the president, I brought to his attention the flaws in UPEC's process, whereby they discriminated against me throughout that process. Details of that are on page 4 of my appeal statement to the president (See file starting with 4c. in the Evidence Packet). The discriminatory actions and racially charged statements that I brought to the president's attention in my appeal letter are all addressed in the previous section: Discrimination Harm/Action #2 – Discrimination in the ECRC and UPEC Process.

But most importantly, on page 7 of my appeal statement, I notified President Nellis as follows:

The vagueness of the UPEC findings is only amplified by their inflammatory nature. For example, the Committee states: "There are ethical challenges and conundrums we've not yet confronted (or been asked to confront) in the review of the documents, such as a safe access to education for all students." (UPEC Letter of Findings, p. 3). Once again, there is no report with sufficient detail, as required by University procedure, to support an assessment of the reasons for this highly prejudicial, yet vague conclusion.

The President's Office has invested a lot of effort to advancing **Diversity and Inclusion as Ohio University's focal mission**. Yet in this particular increasingly prominent case (*which has garnered media attention and appears to continue to do so*), not a single faculty member on the UPEC had experience with Study-Abroad programs, much less any experience supervising student workers in Africa. There was not even a single African-American on the committee, in a case involving a black professor, and no member with adequate experience for activities of international nature that are similar/central to the allegations. Yet the UPEC saw fit to issue a recommendation wildly disproportionate to the charges contained in MOFs.[See file starting with 4c. – page 7, in the Evidence Packet]

President Nellis cannot argue that he was not aware of this type of discrimination leveled against me by both his administrators and the Provost's constituted UPEC. But as he apparently has done

with some other minorities staff and faculty who have left the university recently, he did nothing in my case to show that he cares and certainly he did not resolve the discriminatory practices.

Even Ohio University alum, current faculty, and emeritus reached out to the president and specifically pointed to the doubled standards or discriminatory behavior in this case:

**By Carolyn C. Walcott, part of email to President Nellis, sent January 9, 2019.**
Although I'm not privy to the full details of the current investigation, the decision to detenure Dr. K. seems to some of us in academia to be extreme. It is very sad to see the disrepute brought against Dr. K's character by such an extreme decision. As alumna who have worked with him for many years, and amongst some of us socially connected in our circle to his work, we see this extreme attempt at detenuring him as an indictment against future students who would ultimately lose a quality mentor, who also is an exceptionally talented African professor. The contours of such catastrophic developments have also caused me, also a minority educator who looked up to Dr. K., to consciously assess my own interactions with students as I closely follow and reflect on Dr. K's experience and ongoing predicament there. This is both a lesson and a challenge for all of us, especially minority educators, as we figure out how to maintain healthy and useful boundaries. [*Email to President*, See file starting with 4d.in the Evidence Packet]

**By Dr. Karlyga Myssayeva, part of email to President Nellis, sent Jan8, 2019.**
As a Fulbright Research Scholar for one year at Ohio University, my experience there was amazing. I am forever grateful to Ohio University for the wonderful collaboration we have had because of Dr. Yusuf Kalyango. I stayed at his house for a whole year throughout my Fulbright Research work at Ohio University. Even if I am still a young female professor, I was very comfortable staying with him at his house because he was a gentleman and supportive. I saw firsthand how he brought together and helped many international students for a whole year. He was also my Fulbright supervisor.
…
It is a very sad moment for us to hear all the things happening at Ohio University about Dr. Kalyango and the sexual harassment. Although I cannot judge whether they are true or not true, it is just unbelievable and unfortunate. We want you to know that we value his work and what he has done for KazNU's students and the teachers, and we hope our commitment to work with Dr. Kalyango at Ohio University will continue to develop. He is a well-respected international researcher here and very good at working with our students in the exchange.
[*Email to President*, See file starting with 4e.in the Evidence Packet]

**Prof. Emerita, Dr. Anne Cooper, part of email to President Nellis, Jan7, 2019.**
I write in support of Dr. Yusuf Kalyango, who seems to have been caught in a pendulum swing occasioned by the #Metoo movement. I have known Dr. Kalyango ever since he joined the School of Journalism faculty in 2008. In fact, for about three months he rented a room in my house with kitchen privileges. As many other women can attest, he was a perfect gentleman.
O.U's strong, long standing international ties derive from faculty like Dr. Kalyango, who often navigate 3rd World situations that are no place like home. (I and my late husband faced many when we led an O. U student group to China.) Only those who have shepherded students overseas can appreciate the talent and expertise of an internationalist like Dr. Kalyango.

19

> As a feminist, l am still careful to use my journalism training in assessing gender based situations. Andrew Escobido, Dr. Kalyango is not. O.U would lose an internationally recognized scholar and superb teacher if Dr. Kalyango is dismissed. The case against him is weak, while reasons to keep him are legion.
>
> *[Email to President*, See file starting with 4f.in the Evidence Packet]

Other concerned alumn, particularly minority black professors pressed on the president to respond to their inquiries about my case when he initially ignored them.

> **Professor Dr. Nnamdi Ekeanyanwu, part of email to President Nellis, Jan15, 2019.**
> I wrote you a mail on January 10 and attached two letters (Both are re- attached in this mail) requesting for clarification on the matter concerning Prof. Yusuf Kalyango, our distinguished professor and collaborator with the African Council for Communication Education (ACCE) because of the urgent need to finalize arrangements for our upcoming research convention in Abuja Nigeria, where he is expected to play a major role in both putting the convention together as well as speaking and training media professionals and academics in Africa. It has become URGENT to get further details and possible advice on his situation to enable ACCE progress our collaboration with him and IIJ, Ohio University.
>
> Please, note that it is not the intention of ACCE to interfere in the internal matters of Ohio University so, forgive me if this sounded like that. We just wish to note the situation of our distinguished professor so as to progress the collaboration which is becoming difficult because of the protracted situation involving him at Ohio University.
>
> I will be very grateful if you could acknowledge this mail. I wrote on behalf of ACCE as its President and the non acknowledgement of my mails does not speak well of Ohio University with a solid culture of respect and reputation. I am a proud Alumnus of the SUSI Program of 2011.
>
> *[Email to President*, See file starting with 4g.in the Evidence Packet]

Also in my appeal statement to the president, I brought to his attention the flaws in ECRC's flawed process and Investigator George Antonio Anaya's discriminatory actions. Details of that are on page 4 of my appeal statement to the president (See file starting with 4c. in the Evidence Packet). The discriminatory actions and racially charged statements that I brought to the president's attention in my appeal letter are all addressed in the previous section: Discrimination Harm/Action #2 – Discrimination in the ECRC and UPEC Process.

Through an external legal counsel, Mr. John Marshall of Columbus, Ohio, who is very familiar with civil rights law and a legal expert on the State of Ohio's employment labor laws, President M. Duane Nellis was also formerly notified on December 26, 2018, of the legal consequences of ignoring these calls to remedy these discriminatory harmful misconducts.

> Only when the ultimate decision-maker "conducts an in-depth and truly independent investigation" will the supervisor's bias be purged. Marshall, 854 F.3d at 380. $taub, 562 U.S. at 421, described this disconnection as producing "an adverse action for reasons unrelated to the supervisor's original biased action[.]" See also Sharp v. Aker Plant Servs. Grp., Inc., 726 F.3d 789, 797 (6tI Cir. 2013) ("independent fact gathering" is necessary to defeat a cat's paw claim). A detenurization process which incorporates the ECRC fact-findings roots the ultimate decision in the flawed ECRC findings.

You will learn that Dr. Kalyango has had a distinguished career at OU, and he is committed
to preserving that career. Unless an informal resolution which ensures he can continue as
a tenured Professor is reached, OU will force him to bring a federal lawsuit if the
detenurization process incorporates the flawed ECRC process and he is never afforded an
opportunity to cross-examine before a fact-finder his accuser and her witnesses.
[*Emailed the president on December 26, 2018*, See file starting with 4h.in EP]

Legal counsel, John Marshall also advised the President M. Duane Nellis as he was about to make
his decision to be aware of my rights as a tenured faculty member, without even mentioning the
fact that I am the first ever black faculty member in more than 100 years of the history of Ohio
University's School of Journalism to earn tenured full professorship.

We are hopeful that the pendency of an appeal to the President will facilitate consideration
of the core constitutional issue we would raise in a federal lawsuit. Unless Dr. Kalyango is
permitted to cross-examine before the fact-finder his accuser and her witnesses and a record
is made of the testimony, the detenurization process is invalid as a matter of law. As you
can imagine, Dr. Kalyango has no desire to prolong his suspension, but short of an informal
resolution which enables him to continue as a tenured professor, he does not see any
alternative to a do-over fact-finding.
[*Emailed the president on December 26, 2018*, See file starting with 4h.in EP]

Despite all these calls and abundant information to help President Duane Nellis to make the right
decision to remedy this situation by stopping these discriminatory tendencies permeating the
institution, he instead doubled-down, and supported his newly appointed Executive Vice President
& Provost's decision to proceed with the detenuring process. In his shocking decision, President
Nellis wrote in part the following decision on January 18, 2019:

Faculty Handbook Section II.Q.i states that the grounds for appeal of a UPEC
recommendation are limited to failure to follow appropriate procedures or arbitrary and
capricious decision-making. With this standard in mind, I have decided that there is
sufficient cause to initiate loss of tenure proceedings under Handbook Section II.D.5.
I am forwarding the record of this case to your school for further proceedings under that
provision.
[*Decision by President Nellis: January 18, 2019*, See file starting with 4i.in EP]

In other words, President Nellis acknowledged receipt of all the facts about the discriminatory
actions leveled against me and the lack of due process, but he decided that all these harmful and
illegal practices toward me, although are real, do not fall under the grounds for my appeal of a
UPEC decision, and he therefore did not consider them. This in itself is discriminatory on the part
of the president of the university who, in fact, has remedial power and authority.

## V.     Discrimination Harm/Action #5 – Award: Finalist for the President Teacher Award

Every year since 2001, exemplary Ohio University faculty are nominated, screened, interviewed,
vetted through students, through their peers and their department heads, and a chosen few are
ultimately recognized for their excellence in teaching and meritorious academic pursuits both
inside and outside of the classroom. Selections for this top university award involves a portfolio

review for the work done in the past two or three years, classroom visitations, and personal interviews of the finalists and department chair/school director. Two or three finalists are shortlisted from the exemplary pool and one of them is named the Presidential Teacher for three years. The top finalists and one winner are presented with the coveted awards at a grand ceremony in November before the university community. Due to exemplary teaching and mentoring of our student over many years, I was screened and finally recognized as finalist for the Presidential Teacher Award 2018.

This was a major achievement for me and huge deal for minority black faculty members because I was the very first black male professor to achieve this recognition in the history of this award at Ohio University and no minority black professor has ever been recognized an outstanding teacher at this presidential level with this award. So, my hard work and excellence in teaching our students, advising, and mentoring had finally paid off. But the university, in the most discriminatory action yet again, inflicted harm on me, my hard work, and self-worth.

This all started on May 4, 2018, with email from Associate Provost for Faculty and Academic Planning, Dr. Howard Dewald, who notified me that I was one of the four finalists for the Presidential Teacher Award. Dr. Dewald stated in that May 4, 2018 email: "In the Fall Semester 2018 a formal announcement and recognition ceremony with the award presentation for all finalists and winners will be held. Congratulations!" [See file starting with 5a. in Evidence Packet]

Then on May 30, 2018, my recognition as a Finalist for the 2018/19 President Teacher was made official by President M. Duane Nellis, of Ohio University in a formal letter. In the letter to me, the president stated that "I applaud your work and dedication to your career and the impact you have on our students." The president and the top administration place significant importance to this recognition. The president said in a letter to me that "I encourage you to continue striving for excellence each and every year, as we collectively work to increase national recognition for Ohio University." [See file starting with 5b. in Evidence Packet]

However, I was shocked, felt absolutely prejudiced, and outcasted by the very same university that was supposed to celebrate my contributions to the institution when October 24, 2018, Associate Provost for Faculty and Academic Planning, Dr. Howard Dewald, emailed me to say the following in that crashing message: [See file starting with 5c. in Evidence Packet]

> You may have seen notices of the ceremony planned to recognize the Provost Award for Excellence in Teaching, Presidential Teacher Award, and Presidential Research Scholars at the end of the month. I have the signed and framed 2017-2018 Presidential Teacher Award Finalist certificate for you.
>
> Noting your circumstances and limitations to your presence on campus, I have been asked to privately present the certificate to you. I understand you have a limited time when you are in your campus office? Alternatively, I could simply have the certificate delivered to the department for you? I will appreciate your reply.

In other words, regardless of the fact that this award is meant to be a recognition and celebration of excellence in in teaching and meritorious academic pursuits both inside and outside of the classroom; the university had chosen to discriminate me and treat me a ghost, an outcast, ashamed

22

of standing next to a black man, who is being investigated of allegations of sexual harassment. Just like many stories of minority blacks in this nation's history who are either falsely accused or incarcerated on minor charges with severe penalties, the university administrators chose to discriminate me with extreme vengeance without due process. This, apparently, was happening to me at an institution that I have so evidently served with exemplary achievements. [See file starting with 5c. in Evidence Packet]

Sadly and unfortunately, the Provost's Office simply mailed my Finalist Presidential Teaching Award Certificate (duly signed by the President and the Provost) to my office; per their wishes. [See "Presidential Teacher Award Finalist" file starting with 5f. in the Evidence Packet]

Sadly and unfortunately -- to my bewilderment – On October 10, 2018, the University Communication and Marketing (the main public relations office of the university) sent out an email to the entire university community with exciting news announcing that, "The Ohio University community is invited to celebrate the 2018 recipients of the Presidential Research Scholars award, Presidential Teacher Award and Provost's Award for Excellence in Teaching at a special recognition event on Wed., Oct. 31 in the Baker Center Ballroom A." In this email, the university announced the finalists for the Presidential Teacher Award and **my name was left out**. Can you imagine how crashing and disorienting this can be? The state read:

> Finalists [Presidential Teacher] for the award were Laura Harrison, associate professor in the Department of Counseling and Higher Education in The Patton College of Education, and Chao-Yang Lee, associate professor and coordinator in the School of Rehabilitation and Communication Sciences in the College of Health Sciences and Professions.

Why would Ohio University go to that extent, first to prevent me from being recognized publicly among all my peers, and at the same to go to great length to even omit my name in the formal communication to the university community? This blatant discrimination is disorienting, demeaning especially given my race, and totally perplexing.    [See file starting with 5d. in EP]

To even prove that this was not just a mere error on its part, the University Communication and Marketing once again issued an email on November 5, 2018, from the University Research Communications with a big headline: "OHIO honors excellence in faculty research and teaching at recognition ceremony." The President and the Provost were shown in a happy mood posing in photos with winners and finalists for both the Presidential Teacher Award and the finalists for the Provost's Award for Excellence in Teaching.

Not only was I not invited to be photographed with the President and the Provost, yet again my name was omitted in this main story that announced the awardees at the big ceremony. The official statement to the OU community read:    [See file starting with 5e. in EP]

> "The selection process for these awards is rigorous. Whether you have received an award or were a finalist, you can be justifiably proud of your significant achievement in earning this recognition," Howard Dewald, associate provost for faculty and academic planning, told the audience of faculty, administrators and the award recipients' family members and friends gathered in Baker Center Ballroom.

23

## VI.     Discrimination Harm/Action #6 – Denial of Right to Legal Representation/Support

Another ongoing deliberate and unconcealed discriminatory action against me is the university's denial of my right to legal representation and support in the lawsuit brought by Tess Herman against me and the university. Such defense is required by law and university policy and has been provided by the university for its employees in more than one case. The following white, male and female professors and administrators have been provided legal representation by Ohio University: in *Herman v. OU*, 2:19-CV-00 (S.D. Ohio): G. Antonio Anaya, Chaden Djalali, M. Duane Nellis, and Sara Trower (May 24, 2019); in *Adams et al v. Ohio University et al*, 2:17-cv-00200 (S.D. Ohio): Joseph McLaughlin.

See documentary evidence with a file labeled starting with 6a. in the evidence packet, whereby the outside counsel for Ohio University lists who is represented in the defense by Ohio University in the Tess Herman case. Obviously, the only defendant not provided legal counsel by the university is me, and I also happen to be the only black African employee among the defendants.

Through an external legal counsel, Mr. John Marshall of Columbus, Ohio, legal expert on the State of Ohio's employment labor laws, wrote to Ohio University's Deputy General Counsel, Barbara Underwood Nalazek, on February 11, 2019 to inquire whether the university was considering providing me legal defense in this matter. In that correspondence, counsel John Marshall stated clearly, in part, that:

> We had previously communicated with general Counsel regarding an alleged violation by OU of Dr. Kalyango's procedure due process rights. Perhaps because of that involvement, Ms. Herman's counsel served on us the lawsuit and a request for waiver of process. At this moment, we do not, however, represent Dr. Kalyango in that lawsuit.

> The purpose of this letter is to determine whether OU intends to secure defense counsel for Dr. Kalyango and/or indemnify his expenses and liability. The answer may turn on whether OU has as insurance policy which covers individual faculty members accused of wrongdoing.   …

> We believe that OU has conflict of interest with Kalyango, thereby precluding his representation in the lawsuit by the same defense counsel who represents OU. We need know from you whether OU shares that belief and how wishes to proceed on ensuring that Dr. Kalyango is represented and can afford to defend himself. *See e.g., Ayers v. City of Cleveland*, 2017-Ohio-8571, ¶ 31, 99 N.E.3d 1269, Dist.), *appeal allowed*, 2018-Ohio-3450, ¶ 31, Ohio 3d 1467, N.E.3d (statutory purpose "shield the employee from financial ruin resulting from an act committed in good faith and within the scope of employment").
> [See the 'correspondence to OU' file starting with 6b. – pages 1 and 3, in EP]

Ohio University ignored that February 11, 2019 correspondence from counsel John Marshall.

On February 27, 2019, I wrote to the Honorable Dave Yost, Ohio Attorney General, requesting representation and defense in the above-referenced civil action and I enclosed with my letter a copy of the lawsuit by Tess Herman. I informed the Ohio Attorney General that a graduate student has alleged that I committed non- physical sexual harassment and also alleged that I retaliated

against her by criticizing her employment performance with the Institute for International Journalism (IIJ) as Program Assistant and Administrative Coordinator for the Young African Leaders Institute (YALI) Connect Camps 13 and 14 in 2017. "Ohio University is currently investigating and adjudicating those claims under both its sexual harassment protocol and 'loss of tenure' process," I said in that letter to the Ohio Attorney General. "I vehemently deny that I sexually harassed her or criticized her performance for a reason other than incompetent performance. I never terminated her employment. My opinion is that she brought charges at Ohio University—and then filed this lawsuit against the University and I—in revenge for being reprimanded for her overall poor performance, not because I ever inflicted a hostile environment or was motivated to retaliate. "I vehemently deny that I sexually harassed her or criticized her performance for a reason other than incompetent performance. I never terminated her employment. My opinion is that she brought charges at Ohio University—and then filed this lawsuit against the University and I—in revenge for being reprimanded for her overall poor performance, not because I ever inflicted a hostile environment or was motivated to retaliate."

On that note, I argued that "Pursuant to R.C. 109.361, the Attorney General "shall represent and defend the officer or employee in any civil action instituted against the officer or employee." Ohio University would pay all expenses and court costs, "including the reasonable compensation of special counsel," incurred by your office."

> For purposes of representation and defense, the allegation is that I was a taskmaster who used my official responsibilities to pursue private ends. My defense will be that, at all times material to the Complaint, I acted in good faith to ensure the integrity of the programs. Being an equal opportunity taskmaster is, of course, lawful. Ohio University is likely to take the position that it did not condone any abuse of the power it bestowed on me because I never seemed to be abusing that power and, once it received Ms. Herman's charges, it acted promptly and effectively to remedy any abuse, even suspending me from teaching and other on-campus duties pending the internal investigation.

> For purposes of R.C. 109.362(B), I have asked Ohio University whether it has insurance covering the allegations and been led to believe that it does not. I would most appreciate your approval providing representation and a defense. I trust the presumption of innocence is recognized by your office and my decades of dedicated service demonstrate how out of character sexual harassment and retaliation would be.
> [See correspondence to Ohio AG' file starting with 6c. – pages 2, in EP]

In consultation with my direct employer, Ohio University, the Ohio Attorney General has proceeded to move along with the university's position and has not yet provided me legal counsel like the other employees of the university (M. Duane Nellis, Antonio George Anaya, Chaden Djalali, and Sarah Trower) who are provided with defense, etc., in this same case.

Furthermore, legal counsel, Mr. Greg Beck of North Canton, Ohio, who is a legal expert on civil rights issues and the State of Ohio's employment labor laws, wrote to Ohio University concerning my representation and communicated with the Assistant Attorney General – Education section, Reid T. Caryer, concerning the denial of Ohio University to provide me with legal representation, but that has not yielded anything, which is a blatant racial discrimination considering that other Ohio University employee are accorded this employment right (defense).

**VIII. White/Caucasian, Male Professors Accused (or Convicted): Treated Differently**

Dr. Keith Markman (white/Caucasian male) is Associate Professor in the Department of Psychology at Ohio University. He was found liable for dating violence in 2017 in an ECRC proceeding and he also entered a plea deal in a criminal case against him in court in 2017. This white, male Ohio University Psychology professor was recently reinstated as a faculty member (2017, same time my case was being investigated) without a protracted flawed process. He was charged with aggravated burglary and assault against an Ohio University student, whom he was dating while she was still a student at Ohio University. Susan Tebben, "After Plea Deal, OU Psychology Professor Reinstated," Feb. 24, 2017, WOUB, https://woub.org/2017/02/24/after-plea-deal-ou-psychology-professor-reinstated/.

Prof. Keith Markman was placed on administrative leave (just like me right now) during the investigations back in 2016/17; he was not barred from working with graduate students during his suspension (which is what is happening with me, now going into a second academic year) and he was not subjected to the same restraints on his physical movements as I have been. It was not recommended by ECRC and no one on campus commenced de-tenuring proceedings against him (which is what is happening with me, going into a second academic year now), despite him being charged with aggravated burglary and assault against an Ohio University student, that he was dating. He is still tenured and employed at OU. Jessica Cook from OU's ECRC is quoted:

> "Although (Markman) may have been upset or going through an 'emotional' episode, it is 'dating violence' to push a former or current intimate partner while in the course of a loud, angry argument about the status of your relationship," Cook wrote.
>
> Markman admitted to police that he "broke in" to the woman's house by forcing the front door open, and reports say the frame of the door was broken.
>
> At the end of April, Markman pleaded guilty to criminal damaging/endangering and disorderly conduct-failure to disperse in a plea deal, according to Fairfield County Municipal Court records.
> [See WOUB news article file starting with 6d. – page 2, in Evidence Packet]

Dr. Carson Wagner (white/Caucasian male) was an Assistant Professor in the E. W. Scripps School of Journalism; this white, male professor was known by his colleagues to engage in both inappropriate fraternizing and a suspect living arrangement with an Asian graduate female student in 2016 academic year. One journalism faculty member notified ECRC back in 2016; the ECRC did not launch a full-blown investigation the way they have acted on every complaint they received against me. Professor Michael Sweeney, was aware of these possible Title IX violations by a white, male faculty member (Dr. Carson Wagner) when Prof. Wagner fraternized, socialized, and even conducted graduate class sessions and advising in a bar called Jackie O in downtown Athens, Ohio. Professor Sweeney (as Associate Director of the journalism graduate program) did not report Prof. Wagner and never reacted the way he did in my case. He left OU for medical reasons.

EEOC should request to review Dr. Wagner's personnel file; and in particular, should review his annual peer-evaluation report. Although some of these issues I have raised above are addressed in his annual peer evaluation reports, OU never attempted to terminate him even if he was not tenured.

**IX. Systemic Racial Discrimination on the Ohio University Campus**

The inability of the university to afford me a fair appeal process through UPEC that was not discriminatory, stems from larger systemic racial and national-origin discrimination that has persisted university-wide. As documented by Professor Michelle Ferrier in her lawsuit against the university in 2017, she argued that the Scripps College of Communication has a "history of abuse" against African-American women in leadership roles. She also filed a complaint with the ECRC for race-based and gender-based discrimination; **just like in my situation concerning Professor Sweeney, the ECRC took no action**. Journalist, Conor Morris, wrote in a story "Former Scripps Admin Files Discrimination Suit," *Athens News*, July 19, 2017, as follows:

> The lawsuit alleges that Ferrier, who had been recruited to the Scripps College in 2013 to become its associate dean for innovation, research/creative activity and graduate studies, is the victim of a "systematic campaign to undermine" her role as an administrator at the university, which ultimately led to her losing her deanship and its benefits, including over $15,000 per year in additional income. The lawsuit alleges that she was targeted in this way because of her race and sex.
>
> [See Athens News article file starting with 6e. – page 2, in Evidence Packet]

This ongoing and systemic pattern of discrimination and abuse has resulted in a small number of African-American professors and administrators being hired, the inability to retain African-American professors and administrators, and, thus, of course, the inability of the university to comply with my simple request that the make-up of the UPEC have some representation from the African-American community.

Here is another example of racial discrimination as narrated by a current Associate Professor of Journalism, Dr. Eddith Dashiell (African American female).

> A colleague involved in the matter filed a professional ethics complaint against Dashiell after she raised the issue [of racial discrimination]. "I didn't do any interviews… You didn't see my name in print then," Dashiell recalled, though the story of her case eventually made its way to the media (*The Athens NEWS* covered the story in several articles in the fall of 2002.) She did file a counter claim, she said, "but it's been so long ago" – since before 2000 – so she is far removed from it now.
>
> "The part that hurt or that I found disappointing is not the reaction of that particular faculty member, but the unwillingness of my colleagues who would say they supported me in private to make a public stance," Dashiell recalled. "In private, they would say I was being mistreated and this is ridiculous, but when it came to the public," she noted, her colleagues were silent.
>
> "In my experience, it happens a lot…" she added. "They don't want to take on the status quo or they want to keep a good relationship with the rest of the faculty or whatever." Another African-American faculty member had a complaint filed against her around the same time, Dashiell said, and that story appeared in the media, too. "How do you protect students when you can't even protect yourself?" she asked. "That sent out a signal… If you didn't want to get blasted like that in the newspaper, then you didn't talk. (It created a) chilling effect." [See *Athens News* file starting with 6g. – p. 2 & 3, in Evidence Packet]

27

All employment discrimination is illegal and intolerable; in the context of higher education, however, the effects are more pronounced and long-lasting as not only is the individual employee affected, but all those students, and future students, who are deprived a diverse faculty, deprived of the educational benefits these faculty afford, and deprived of the essential role models these faculty provide for professional and academic careers. Dr. Ferrier decried the discrimination that impacted her financial and emotional stability that she was forced to give up and look for other opportunities before some OU individuals would permanently destroy her professional reputation in the news media (which has happened to me) (*See news file starting with 6h. in the evidence packet*).

My own study-abroad programs to African countries, otherwise so essential and successful in teaching multicultural competencies and lessening the bias based on national origin and other global lessons, have been entirely decimated through this individual and systemic discrimination.

## X. Conclusion

It looks like the protections and rights of my fellow workmates—such as Professor Michael Sweeney and Assoc. Professor Keith Markman, and others—who are white/Caucasian, are inalienable; but the requests, appeals, and rights of minority African American employees like me can only be fulfilled by my magnanimity and surrender to the will of some individual discriminating administrators. Also, regardless of my exemplary annual performance plus my hard-earned rewards and recognitions, which is better than some of our white/Caucasian peers; these achievements in the past decade can only mean something if I also consistently and exceedingly demonstrate 'acceptable conduct' that is different and goes beyond our practices in the school of journalism, apparently a double-standard not expected of my non-black peers, who run no risk that ordinary teaching and mentoring behavior will become demonized.
[See *"Annual Performance Peer Evaluations" file starting with* 6i., *in the Evidence Packet*]

For all the above reasons highlighted in the above sections, as well as evidence tending to show that Ohio University has been in violation of EEOC requirements for many years in reference to its employment practices, I respectfully request that the EEOC launch a full investigation on this matter that is bound to destroy both my professional career and the future of my young sons.

Sincerely,

Yusuf Kalyango Jr., Ph.D.
Professor,
E. W. Scripps School of Journalism
Ohio University